Glen WARREN and Peggy Warren,
Plaintiffs-Appellees,

v.

FORD MOTOR CREDIT COMPANY and
Larry Diefenderfer,
Defendants-Appellants.

No. 81–7948.

United States Court of Appeals,
Eleventh Circuit.

Dec. 27, 1982.

Rushton, Stakely, Johnston & Garrett, N.T. Braswell, Robert A. Huffaker, Montgomery, Ala., for defendants-appellants.

Steven F. Schmitt, Tallassee, Ala., Nomberg, McCabe & Fulford, Donald C. McCabe, Daleville, Ala., for plaintiffs-appellees.

Before JOHNSON and ANDERSON, Circuit Judges, and HUNTER *, District Judge.

EDWIN F. HUNTER, Jr., District Judge:

This is a diversity action. It involves repossession and sale of a 1972 Ford automobile. Plaintiffs, Glen Warren and his wife Peggy Warren, charge the defendants, Ford Motor Credit Company (FMCC) and Larry Diefenderfer, with two counts of conversion—one for wrongfully repossessing and selling the automobile, and another for failing to notify the Warrens that the automobile had been repossessed and would be sold. The trial jury, rendering a general verdict, awarded $1,350 as compensatory damages and $54,100 in punitive damages.

Defendants moved, under Rule 50(b), for a judgment notwithstanding the verdict, and in the alternative for a new trial and/or remittitur. The trial court denied all defense motions. This appeal followed.

### STANDARDS OF REVIEW

The decision in *Boeing v. Shipman,* 411 F.2d 365 (5th Cir.1969, en banc), articulates the standard by which to judge the propriety of a judgment notwithstanding the verdict:

> The Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in a light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v.

* Edwin F. Hunter, Jr., U.S. District Judge for the Western District of Louisiana, sitting by designation.

should not be decided by which side had the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences and determine the credibility of witnesses. Id. at 374–75.

A district court's denial of a new trial is reviewed under a different standard:

"[T]he operative factors underlying review of a ruling on a new trial motion are deference to the trial judge, who has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record, deference to the jury's determination of weight of the evidence and quantum of damages, and the constitutional allocation to juries of questions of fact ..." *Massey v. Gulf Oil Corp.,* 508 F.2d 92, 94, 95 (5th Cir.1975).

With the proper standards of review in mind, we have reviewed the record and now recite the facts.

In December, 1973, Wilson Baldwin purchased a used 1972 Ford automobile from Bondy's Ford. The purchase was effected by a retail installment contract entered into by Baldwin and Bondy's calling for twenty-four monthly payments and giving Bondy's a security interest in the automobile. Bondy's assigned its interest to the defendant, Ford Motor Credit Company.

Baldwin lived in a trailer next door to the plaintiffs, Glen and Peggy Warren. Baldwin used as his mailing address the same address as the Warrens. He was in the United States Army, and in 1974 was transferred to an overseas duty station. Prior to being transferred, Baldwin offered to give the automobile to Peggy Warren in exchange for her making the remainder of the payments. Thereafter, Peggy Warren, with the assistance of her husband, made all payments.

The installment contract called for 24 monthly payments. Payments were due on the 10th of each month. The first was due on January 10, 1974, and the last on December 10, 1975. The Warrens were often late with their payments. On at least three occasions extensions were granted. As a result, the overall period of payment under the contract was extended so that the last—the 24th payment—was due on March 10, 1976.

In January of 1976 the automobile was damaged by fire and was taken to Ed Sterling Ford of Enterprise, Alabama for repairs. On February 13, 1976, the Warrens made a monthly payment in the amount of $112.86, and on the same day $100 was paid by the Warrens to Ed Sterling toward the repair estimate of $676. Then, on March 10, 1976, while still at the shop for repairs, the automobile, primarily at the direction of Diefenderfer, was repossessed by FMCC. This repossession was without knowledge to the Warrens.

Notice of the intended disposition sale was mailed to Baldwin at the Warren address. Diefenderfer knew Baldwin was not there and that he was in the military service. No notice was sent to the Warrens advising them of the intended disposition sale. The notice to Baldwin was received by the Warrens' 16 year old daughter. The Warrens never received or saw the letter.

On March 20th, Peggy Warren, without knowledge that the automobile had been repossessed, made what she thought would be the final payment under the contract. Nevertheless, FMCC put the repaired automobile up for sale as noticed, and on April 9th issued a bill of sale of the vehicle. The Warrens subsequently learned of the repossession and sale.

The case is based on two counts of conversion, which is defined as "a wrongful taking ... or an illegal assumption of ownership, or an illegal use or misuse." *Ott v.*

*Fox,* 362 So.2d 836, 839 (Ala.1978). The first count asserts that defendants converted the automobile by wrongfully repossessing and selling it. The second count is pegged on the failure to notify the Warrens that the automobile had been repossessed and would be sold. FMCC and Diefenderfer challenge the sufficiency of the evidence as to both counts.

### COUNT I

The validity of the first count—conversion by wrongful taking and selling—turns on whether FMCC had legal title to the automobile, and thus the right to possession of it on March 10th. If the February 10, 1976 payment was delinquent, and as a result the retail installment contract in default, then under Alabama law FMCC had legal title and the accompanying right to repossess; whereas, if the February 10, 1976 installment had been paid, then the contract was not in default, and FMCC had no legal title and its repossession was wrongful and amounted to a conversion.

"To constitute conversion, there must be a wrongful taking or a wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse. *Webb v. Dickson,* 276 Ala. 553, 165 So.2d 103 (1964); and *State Farm Mutual Automobile Insurance Co. v. Wagnon,* 53 Ala.App. 712, 304 So.2d 216 (1974). The gist of the action is the wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has general or special title to the property or the immediate right to possession. *Jones v. Americar, Inc.,* 283 Ala. 638, 219 So.2d 893 (1969)." *Ott v. Fox,* 362 So.2d 836, 839 (Ala.1978).

We have here a classic case for a jury's determination—a courtroom swearing match where plaintiff said "I did" and defendants said "my records show you did not." The jury believed the plaintiff. There, our inquiry ends.

 Defendants argue on appeal that Wilson Baldwin defaulted under the con-

tract when he transferred the automobile to the Warrens. It can not be disputed that in March, 1974 (when Baldwin transferred his interest) that plaintiffs took the vehicle subject to the perfected security interest of FMCC. However, the defendants knew of this transfer of ownership and possession of the vehicle. Instead of declaring the contract to be in default, they collected the payments from the Warrens and extended payments on the account whenever requested to do so. From March, 1974 until March 10, 1976, defendants decided it would not be in their best interest to declare the contract in default due to the transfer of the vehicle. It was not until after this law suit was filed that this particular claim of default was raised. The claim of default due to transfer of the vehicle to the Warrens was not argued by the defense at trial. There was no request for any jury instructions as to the transfer of the vehicle constituting a default. The court did not charge the jury on this issue. No objection was made to the court's charge. In our opinion defendants had long since waived this default prior to the repossession of March 10, 1976. By continuing to accept payments from the Warrens the defendants are now estopped from asserting the transfer as a default after they have, by their actions, waived the default. See *Ott v. Fox,* 362 So.2d 836, 839 (Ala.1978).

We affirm the district court's conclusion that the evidence was sufficient to sustain a finding that the contract was not in default on March 10, 1976 and, accordingly that because FMCC did not have legal title to the automobile, its repossession was wrongful and amounted to a conversion.

### COUNT II

In denying defendants' motion for judgment notwithstanding the verdict and in the alternative the motion for a new trial, the district court enunciated a correct recitation and application of the facts to the statutory notice requirements of Alabama law. He stated:

"FMCC and Diefenderfer's challenge to the validity of the second count—conversion by failing to notify Peggy Warren that the automobile had been repossessed and would be sold or otherwise disposed of—is based on the same grounds given in support of their challenge to the first count. Again, their challenge is without merit.

"The duty of a repossessing secured party with respect to notice of a proposed disposition of the collateral is established by § 7–9–504(3), Code of Alabama 1975, which section provides in relevant part that:

"Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor . . .

"Furthermore, according to § 7–9–105(d), Code of Alabama 1975, the Warrens as owners of the collateral in the instant case are considered 'debtors' within the meaning of section 7–9–504(3) and were entitled to notice by FMCC of the proposed sale. Section 7–9–105(d) provides that:

" 'Debtor' means the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts, contract rights or chattel paper. Where the debtor and the owner of the collateral are not the same person, the term 'debtor' means the owner of the collateral in any provision of the article dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires . . .

In the instant case, as already noted, the evidence was most ample that FMCC and its agents, including Diefenderfer, treated and considered Peggy Warren as the owner of the automobile for a period of two years; for example, they accepted payments from her and entered into modifications of the retail installment contract with her by agreeing in writing to extension of payments. Yet, when it came to the point of sale of the automobile, FMCC and Diefenderfer ignored Peggy Warren's status as owner and failed to accord her her notice rights under the above section."

 We affirm the district court's conclusion that the evidence was sufficient to sustain a finding that FMCC and Diefenderfer ignored Peggy Warren's status as owner and failed to accord her the required notice. This constituted a conversion under Alabama law. *First Alabama Bank of Montgomery, N.A. v. Parsons,* Ala.Civ.App., 390 So.2d 640 (1980).

## ALLEGED PREJUDICIAL REMARKS

Appellants complain that a new trial should have been granted on the basis of prejudicial remarks by plaintiffs' counsel during closing argument. The record reveals the following remarks and responses:

MR. McCABE: Now, ladies and gentlemen, this is a big finance company. Mr. Gregory gets up here and testifies that they've got 14 outlets in the southeast area—I don't know how many they've got over the rest of the U.S., but we've asked for a hundred thousand dollars in punitive damages.

Now, I submit to you that if—that this is going to have to be substantial, or it's going to make no difference to this company that goes out and repossesses people's vehicles . . .

MR. BRASWELL: Your Honor, this is not in evidence. He's talking about facts that are not in evidence. It's highly prejudicial and I move for a mistrial.

THE COURT: Okay, Mr. McCabe, just stick to the evidence that's in the case.

MR. McCABE: Yes, Your Honor.

THE COURT: And, I'll deny your motion for a mistrial, and I'll ask the jury to not consider anything other than the evidence that's in the case.

MR. McCABE: Thank you, Your Honor. The evidence in the case, they've put on Mr. Gregory, and says they have 14 outlets in the southeast, and that makes them a big finance company, and ladies and gentlemen of the jury—.

MR. BRASWELL: Your Honor, that's a mistatement [sic], and I again move for a mistrial.

THE COURT: Let me see the attorneys in the back for just a moment.

(Off the record discussion)

THE COURT: Members of the jury, I want to caution you to disregard those last comments by Mr. McCabe, with respect to anything that's not in evidence in this case. In other words, any statements about the condition of the defendant, and so forth. That's not for you to consider. That's not a part of your consideration. You are to stick to my charge to you on the law, and what evidence you've heard from the witness stand, and I caution Mr. McCabe to make no further reference to that. I'm going to deny your motion for a mistrial, and the jury is not to consider it. Don't consider it. Go ahead, Mr. McCabe.

 Defendants are correct in that a jury generally may not be informed of the wealth or poverty of the parties, subject to certain recognized exceptions which are not applicable here. *Allison v. Acton-Etheridge Coal Co.,* 289 Ala. 443, 268 So.2d 725, 728 (1972). We certainly do not endorse the argument. However, the district judge was scrupulously fair. He immediately corrected the error to the extent correctible, and acted well within his discretion and peculiar competence in assessing the error as not sufficiently inflammatory to call for a new trial. We find no error in this conclusion.

## PUNITIVE DAMAGES

The law on punitive damages in conversion cases has been clearly enunciated by the Supreme Court of Alabama in *Hughes Chevrolet, Inc. v. Gordon,* 294 Ala. 638, 320 So.2d 652 (1975):

"... [T]his court has frequently said that the award of punitive damages, while discretionary with the jury, is permissible where the evidence shows legal malice, willfulness, insult or other aggravating circumstances. *Russell-Vaughn Ford, Inc. v. Rouse,* 281 Ala. 567, 206 So.2d 371 (1968); *Roan v. Smith,* 272 Ala. 538, 133 So.2d 224 (1961).

"However, it has never been stated that one must show, before a jury issue is made out on the question of punitive damages, that the intentional wrongful act must be accompanied by rudeness before punitive damages are allowable." (at page 654, 320 So.2d 652).

See also, *Gunite Contracting Company v. Mize,* 341 So.2d 694, 695 (Ala.1977); *Richard Kelley Chevrolet Co. v. Seibold,* 363 So.2d 989, 1022, 1025 (Ala.Cir.App.1976); *Richard Kelley Chevrolet Co. v. Williams,* 343 So.2d 776 (Ala.Civ.App.1977). The Fifth Circuit addressed this same issue in *Adams v. FMCC,* 556 F.2d 737 (1977).[1]

 In the instant case defendants knew the Warrens owned the car on March 10,

---

1. The verdicts in these cases were primarily for punitive damages in the following amounts:

| | | |
|---|---|---|
| Hughes | – | $14,783.38 (punitive and compensatory) |
| Gunite | – | 4,600.00 |
| Siebold | – | 5,500.00 |
| Williams | – | 5,000.00 |
| Adams | – | 20,000.00 (punitive and compensatory) |

1976, and for one reason or another refused to give them either oral or written notice of either the repossession or sale. Then, too, the repossession—which the jury apparently found to be wrongful—was aggravated by the fact that it came when the Warrens owed only one more payment and the sale was made after the tender of what they considered to be the last payment. We understand and appreciate appellants' arguments—that there was an honest difference of opinion as to whether the payments were delinquent on March 10th. Nevertheless, there is evidence in the record which justified the jury's believing that the plaintiffs' car was converted by defendants in reckless disregard of the owners' rights and under circumstances that aggravated the seizure and sale, authorizing in its discretion an award of punitive damages.

### REMITTITUR[2]

■ The Alabama Supreme Court has stated that "punitive damages are discretionary with the jury, depending on the enormity of the wrong and the necessity of

**2.** "The measure of damages for conversion is the difference between the reasonable fair market value of the item converted and the balance due on the mortgage debt at the time of conversion, plus interest. *Ford Motor Credit Co. v. Jackson,* 347 So.2d 992 (Ala.Civ.App.1977)." *Brown v. Bateh,* 362 So.2d 841 (Ala.1978). Mindful of this rule, the trial judge precisely charged the jury and the evidence clearly supports the award of $1,350 for compensatory damages.

**3.** The Code of Alabama, § 12–22–71 (1975), authorizes an appellate court to set aside that part of the judgment which it deems to be in excess of the just and proper amount of recovery. To order a remittitur, an Alabama appellate court must hold "that the presumption of correctness of the jury verdict is overcome by a clear showing that the amount of the verdict is the product of passion, bias, corruption, or other improper motive or cause." *Ridout's-Brown Service, Inc. v. Holloway,* 397 So.2d 125, 126 (Ala.1981). "Remittiturs are favored in proper cases for the promotion of justice and the ending of litigation." *Southern Cement Co. v. Patterson,* 271 Ala. 128, 122 So.2d 386, 392 (1960); *Aspinwall v. Gowens,* 405 So.2d 134, 137 (Ala. 1981). The remittitur question has arisen in

preventing similar wrongs." *Winn-Dixie Montgomery, Inc. v. Henderson,* 395 So.2d 475, 477 (Ala.1981). The standard of review of allegedly excessive damages, whether punitive or compensatory, does not differ as between the Alabama rule and that followed by the federal courts. *Adams v. Ford Motor Credit Company,* 556 F.2d 737, 740 (5th Cir.1977).[3] For all purposes relevant here, Alabama courts are the masters of Alabama substantive law. Nevertheless, the proper role of federal trial and appellate courts, in reviewing the size of jury verdicts, is a matter of federal law. *Donovan v. Penn Shipping Company,* 429 U.S. 648, 649, 97 S.Ct. 835, 836, 51 L.Ed.2d 112 (1977); *Maxey v. Freightliner Corp.,* 665 F.2d 1367, 1374 (5th Cir.1982); *Carlton v. H.C. Price Company,* 640 F.2d 573 (5th Cir. 1981).

Defendants argue that although the evidence might have authorized a verdict for plaintiff as to conversion, it (the verdict) could have been for either party. They insist that the punitive damage award of $54,100 was shockingly excessive, oppressive and contrary to all reason and good con-

various contexts, including personal injury cases, *Southern Cement,* supra; fraud cases, *Winn-Dixie Montgomery, Inc. v. Henderson,* 371 So.2d 899 (Ala.1979); eminent domain cases, *State v. Ferguson,* 289 Ala. 44, 110 So.2d 280, 282 (1959); and wrongful-eviction-of-tenant cases, *Ferguson v. Callahan,* 262 Ala. 117, 76 So.2d 856 (1954). Thus Alabama courts, in determining the amount of a remittitur, are guided by a "maximum recovery rule" which permits reduction of the verdict only to the maximum amount the jury could have awarded. The Alabama Statute (12–22–71) states in pertinent part:

When an appeal is taken to the appropriate appellate court from the judgment of any court and the appellate court shall be of the opinion that the case should be reversed because the judgment of the lower court is excessive and that there is no other ground of reversal, the appellate court shall notify the appellee of the amount *which it deems in excess of the just and proper amount of recovery* and require the appellee, within a time to be stated in said notice, to remit such amount upon penalty of a reversal of the case. (emphasis added).

science. The record is replete with instances of FMCC working with and accepting late payments over the duration of the account. At the end of the payment schedule the 1972 Ford Maverick, with 105,000 miles, had been burned. The district court, referring to Mrs. Warren's testimony as to delinquency, noted:

> "[H]er testimony consisted in part of hearsay—that is, statements by Baldwin to her that the account was current and that he had made payments for each of the missing coupons—and in part of her personal knowledge—that is, that thereafter she made a payment for each missing coupon and that on March 10, 1976, only one coupon remained and thus all but one payment, the March 10 payment, had been made. While this Court would itself have great reservations about basing a factual finding on such evidence, it is not the Court's subjective opinion on this matter that is controlling."

██ Our power to fix remittiturs is the same as that of the trial court. *Carlton v. H.C. Price Company,* 640 F.2d 573, 582 (5th Cir.1981). We must grant a new trial or remittitur when the award "exceeds the maximum limit of a reasonable range within which the jury may properly operate." *Keyes v. Lauga,* 635 F.2d 330 (5th Cir.1981); *Bonura v. Sea Land Service, Inc.,* 505 F.2d 665 (5th Cir.1974); *Gorsalitz v. Olin Mathieson Chemical Corp.,* 429 F.2d 1033 (5th Cir. 1970), modified 456 F.2d 180 (5th Cir.1972), cert. denied 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972).

██ Considering all relevant evidence, we conclude that the punitive damages award exceeds the "maximum limit of a reasonable range." It is neither "just nor proper." We find $20,000 to be the maximum allowable recovery for punitive damages in this case (*Gorsalitz,* supra) and order a conditional remittitur to that amount. There is no need to remand to the trial court because it has previously determined that the verdict should remain intact.

In summary, we affirm the trial judge's denial of defendants' motions for judgment n.o.v. and for a new trial, with the exception of the motion for a new trial on the issue of punitive damages. We find $20,000 to be the maximum possible recovery for punitive damages and order a conditional remittitur to that amount. If plaintiffs refuse the remittitur, the district court is to grant a new trial solely on the issue of punitive damages.

AFFIRMED in part, REVERSED in part and REMANDED.